All right, let me just make sure our council is here. So for the first argument is prawns versus bimbo foods. Mr. Perlmutter, you're here. Good morning, your honor, yes, sir. Great, and Mr. Salins, you're here as well? Yes, your honor. Okay, very good. So you each have 10 minutes. Mr. Perlmutter, you've reserved two minutes for rebuttal. Yes, sir, thank you. Pay attention to the clock on your screen. It'll be functioning just like the lights when you're here in person. All right, so you may proceed. Thank you, good morning, may it please the court. Randy Perlmutter for Plaintiff Appellants, Nick Franz and George Shroofer Jr. who urged this court to reverse the decision of the lower court, which reads more like findings of fact than conclusions of law. The key question, as this court reiterated in the recent Agerbrink versus MSA decision, is whether as a matter of economic reality, Franz and Shroofer depended on bimbo's business for the opportunity to render service or whether they were in business for themselves. As was the case in Agerbrink, these are material facts. Those facts among many others are in dispute, making summary judgment inappropriate and requiring this matter to be remanded for trial. Excuse me, just at some point during your eight minutes, if you would focus for me on Saleem and why this is different from Saleem, please. Yes, sir, yes, sir. I'm gonna go right into that right now. Thank you. The lower court's first site on the control factor was from the United States Department of Labor and it's very instructive. It says a business may have control where, for example, it requires a worker to work exclusively for the business, disavow working for competitors, have inflexible shifts, or work long hours so that it is impractical to work elsewhere. This case is nothing like Saleem. Saleem were black car linozene drivers who could work as they pleased, who could refuse assignments without penalty, and as this court noted eight times in that decision, could toggle back and forth and work for different companies. So this court cited the absence of a non-compete as showing that the company relinquished control over the Saleem drivers. The converse is here. Isn't it true that one of your clients had another job, a security job? That's right, yes. Nick Franz worked some sporadic security jobs over the eight years he was a distributor, but that has no bearing on whether or not he has a claim under the FLSA or he's an employee of Bimbo. The FLSA makes it clear, in this economy and other economies, people have more than one job. It's not- There's nothing, Mr. Perlmutter, there's nothing in the contract or in the relationship that prevented him from, while he was distributing Bimbo's products, to customers that he had procured and or that Bimbo had negotiated those agreements with, from selling some other product out of his truck, could it, was it? He could have sold potato chips, right? That's correct, your honor. However, the record shows that even George Stroofer, who worked for Bimbo as an employee, prior to being unilaterally changed to an independent contractor in 1996, wouldn't even know where to get products. In other words, these- That's not a function, that's not a function of Bimbo's control, that's a function of Stroofer's not knowing what to, how to be, how to get other business, for God's sake. That's just a bad business, man. That's not, that's not control. Well, your honor, I respectfully, I respectfully agree with that point, but I disagree to this extent. These- Okay. These were full-time jobs for George Stroofer and Nick Franz. They worked 40 to 55 hours, starting early in the morning till mid-afternoon, working exclusively for Bimbo. And the contractual provision, the non-compete, this circuit has never upheld a summary judgment case and a misclassification case where a non-compete of this magnitude was in existence. In fact- But Mr. Perlmutter, I mean, certainly your clients could have hired other people to drive, right? And they, they didn't, the fact that they were doing it full-time is, I guess, a fact, but it didn't have to be the case under the agreement, right? That's correct, your honor. And that was an issue in the Rezat case versus Uber in the third circuit, which the lower court relied upon, defendants cited in their brief, and which was also overturned. That was one of the issues. Can people work for other, can people perform the services? Nick Franz testified that he couldn't hire people to perform other services because it would eat away his profit. Normally, when you hire other people as an independent business owner, it's because you've expanded your business to a level where you're expanding, you're growing your revenue. These drivers who worked full-time, they had to hire people just to cover vacations. If Mr. Franz was sick, his daughter was in the hospital, he got a breach letter because he couldn't find anybody to fill his place. So he got a breach letter from what's supposed to be his agent. He's the principal in this relationship from allegedly his agent, who then said, you did not make a delivery, therefore you're not in compliance with your contract, fix that problem. But he was able to, I mean, he could have expanded and bought more, acquired more territories. He could make arrangements for other people to manage his territories. All that sounds like a classic independent contractor, doesn't it? No, Your Honor, respectfully. I think that's a red herring. The fact that you have either the capital, the wherewithal to acquire more space doesn't change the nature of the employer-employee relationship. It's what George Shroofer did, it's what Nick Franz did that matters. And again, these plaintiffs do stand on their own because there are some factual differences between the two. But one is that Mr. Franz never acquired another area. So it's the economic realities, what he did do that matters, not what he could have done that matters. But it doesn't change the very core that BIMBO craft their distributor agreements in such a way that gives them control over product pricing, placement, promotions. Wait a second, you said product pricing, but with regard to like institutional purchasers, they have the right to go outside that and negotiate their own prices, couldn't they? That's incorrect, Judge Wesley. That has to do with smaller customers such as gas stations and delis. In other words, the prices were set by BIMBO. The institutional customers are prisons and schools. And that's right up here. Those cannot be plaintiff's customers. The defendants place sealed bids to New York State if they set the prices. Is that because of the New York procedures or New York laws that requires it? Not BIMBO bakeries requires. I mean, it rises out of a state requirement, right? Right. If I understand your question correctly, Your Honor, the state requirements for bids. It's BIMBO's choice to bid on the product. It's not Mr. Franz or Mr. Schroofer's choice. These are allegedly his customers. They're not his customers. And what happens is BIMBO bids on these institutions at artificially low prices. We have our confidential appendix, the sales reports are in there, the contracts are in there. And then Mr. Franz and Mr. Schroofer get a schedule posted in the warehouse. They have to deliver the products at times and places directed by the defendants, not even the prisons. If there's a problem, the prisons or schools communicate with BIMBO, BIMBO tells Franz and Schroofer what to do and they have to do it. They have zero discretion. And these are customers that make up up to 88% of their sales revenue. Judge Beaumont, the lower court focused on the fact that they could go outside this agency provision, which we believe is a sham and we briefed that in detail, and make money off these smaller gas stations and delis within a very restricted geographical scope. And both plaintiffs said they couldn't do that. Both plaintiffs said those opportunities weren't there, they weren't profitable. So BIMBO retained control contractually and in the economic reality over every significant part of the actual job duties. Could they opt out of the agency clauses? By contract, yes, your honor. In reality, no. I see my time is up, your honor. Well, you can go ahead. Yes, your honor. Matter of fact, revocation is impractical. First of all, in the institutional customers, you can't do it. It's impossible. The wording of the contracts prohibits an individual distributor from being a contractor for a prison. When it comes to the chain stores, even defendants own witnesses testify. But that, and I apologize. No, sir. That's fine. I want to pursue this just for a second. That's not necessarily a function of the contract as much as it is the fact that you have a state purchasing agent who wants to deal with one supplier. So it's, but that doesn't make him an employee through the back door because the state somehow has these requirements, does it? Well, respectfully, I disagree. The state has requirements to bid for contracts and then rules to fire them. The defendants dictate those rules to the plaintiffs who have no choice. They have to, if I'm an independent business owner, I can deliver who I want to. I can go outside of my geographical area. I can go to different customers. In the institutional bent, the words of the contract themselves don't allow, they're for businesses. They're not for individuals. So the agency replication wouldn't be valid. And defendants couldn't answer that question during depositions. When we asked about the chain stores, like a ShopRite or Walmart or something like that, they testified that the businesses would not want to do business with the individual distributor. Tony Paris, who was another distributor, said, don't deal with me. Thank you. Thank you. You're welcome, sir. Thank you. You're welcome, sir. I noticed my time is up, so unless there's other questions, I'll... All right. Thank you, Mr. Perlmutter. You've got two minutes in rebuttal. So we'll come back to you for that. Thank you, sirs. Thank you. Sure. And now, Mr. Salmons, you've got 10 minutes uninterrupted. Well, not uninterrupted, but 10 minutes for that. I welcome the interruptions, your honors. Can you hear me okay? Yes. Thank you, your honors. May it please the court. I'm David Salmons on behalf of the appellees. The district court properly applied the factors set out by the Supreme Court in Silk and this court in Saleem. And looking at the facts in the light most favorable to them, it correctly held that the distributors are independent operators and not employees. Saleem makes clear that the ultimate concern is whether as a matter of economic reality, the workers depend upon someone else for the opportunity to render service or are in business for themselves. And here it's clear they were in business for themselves for three primary reasons. The first is the longstanding course of conduct and understanding between the contracting parties. It is undisputed that the plaintiff selected and purchased their distributorships or routes with substantial investment and with the understanding that they would be running them as independent businesses. They entered into distribution agreements with BMBO with the intent to maintain their role as independent contractors for all purposes. They manage their businesses for many years, sometimes buying and selling rights to additional routes to grow their businesses. And they file tax returns for years, reflecting their status as independent business owners and not employees. That consistent course of conduct over many years reflects the economic realities of their relationship far better than plaintiff's belated efforts to recast them. Second, turning to the silk factors, those factors, especially the first three, degree of control, opportunity for profit and loss, and investment in the business, and degree of skill and independent initiative overwhelmingly support independent operator status. Each distributor decided which routes to buy or sell. And again, Appellant Schroepfer bought and sold rights to many different routes over the 20 years or so he managed his business. He made significant investments to acquire those rights, decided what trucks to buy or lease, paid all expenses associated with their distributorships, decided whether to hire workers and who to hire. They bought BMBO products outright and made profit only by selling the products to outlets in their area at a higher price. And both their profit and the value of their routes as assets were subject to many market forces, including competition, managing their expenses, their ability to add new customers and the prices and other terms they were able to negotiate. And even with chain outlets, distributors were free and did negotiate directly with outlets to set or modify terms. A good example of this is the $1 general outlet that Appellant Schroepfer identifies as being unprofitable on appeal. I would note that Appellants identified no unprofitable chain outlets below and only raised this on appeal, but Schroepfer himself made clear that he approached the outlet directly and negotiated to reduce his delivery days from five to two to address his concern. That's it, appendix 447 to 48. That only proves that even with chain outlets, the distributors exercised the express right provided to them under the distribution agreement to negotiate directly with chain outlets in their areas. And both appellants testified during depositions that they communicated directly with chain store managers about promotions and about the layout of the displays and Appellant Schroepfer testified. And this is, and this is at appendix 478 and 79 that he didn't follow the planograms, they're called, that lay out how a product is to be displayed in the stores or any agreement with those chain outlets that he himself made his own judgments about how to display the items to ensure maximum sales. So even with regard to change, there's a substantial amount of control and opportunity for profit and loss on the part of appellants. And then the third main point I would make is that there's no need for a remand here to resolve undisputed facts. All the facts we point to and the facts that distributors point to are undisputed. The question of how to apply the legal factors to those facts to determine independent contractor status is a question of law. Resolving any and all factual disputes, if they exist in the distributor's favor, you are still left with the legal conclusion that distributors operated their own independent businesses and were not employees. Mr. Chalmers? Yes. I guess one of the questions I had with respect to Judge Roman's analysis was the fifth superior care factor. And that's the extent to which the employees or the putative employees were, that their work is an integral part of the employer's business. Judge Roman basically said that the primary business model was a bakery product manufacturing, which doesn't seem right for the BFBD. That doesn't seem to be what they were in the business of. But even if it were, it seems to me that delivering your goods to market is pretty integral. Yes, Your Honor. Thank you for the question. The first point I would make is that this court and others have recognized that this factor, the how integral the services are to the functioning of the business is one of the less important factors. In Saleem, for example, the business was only driving, providing transportation services to people. And so the drivers were not only integral, they were the entirety of the services that were being provided. And yet the court found that they were still independent operators. And here, while there's no doubt that getting these products sold and distributed and displayed appropriately in the customer stores is important to BIMBO's business. BIMBO as a general matter is in the business of manufacturing baked goods for market.  And then managing the independent distributorship rights that are provided for this business. Neither is primarily in the business of transportation as was the case in Saleem. So while this factor, I think you're right. And we do not deny that it's very important to BIMBO to get these products effectively sold and distributed and displayed in stores that that factor still does not support employee status and still supports independent contractors. The last point I would make, Your Honor, is that it's a kind of a practical point that any holding other than an affirmance here, I think runs the risk of unsettling substantial financial investments and tax returns of the many other BIMBO independent distributors who are not part of this case and who likely have no desire to be treated as employees or have the value of their distribution rights diminished as a result of such a holding. And so for all these reasons, we think the decision below should be affirmed. I'm happy to address, please. What do you make of your opponent's assertion that 88% of the revenues come from institutional contracts or other contracts that are essentially negotiated by your client? And so therefore the terms of play are pretty much dictated by you as opposed to the driver and the ability to negotiate with the end purchaser. Several responses to that, Your Honor. First, the percentage of revenue that comes from chain stores versus what are referred to often as cash stores, the smaller entities that the distributors have the right to go and negotiate all of the terms themselves. They're sort of entirely in control of those relationships. But the ratio obviously depends on how active the distributors are in pursuing those opportunities. And Bill and Trufer testified that the percentage for him over the 20 or so years he ran his business fluctuated significantly. I'm sorry, please continue answering. I have a question when you're finished. Oh, thank you, Your Honor. Secondly, it's still the case that with those chain stores, the appellants had significant influence and control over the relationship. While BIMBO negotiated as an initial matter as their agent to find out what the best terms they could get from the chain stores as a whole, the contract is very clear that not only do they have the right to revoke that, but even apart from that, and I think this helps explain why the appellants here didn't bother with any revocation, they have the right to negotiate directly with any chain outlets in their areas and to alter the terms of any negotiation that was the product of BIMBO's efforts. And that's true of the chain outlets, but not... That's true. I'm sorry, Judge Sack, I didn't mean to jump you. But that's not true. No, no, no, no, no. That's not true of the institutional customers, is it? Well, so as a matter of the contractual rights and the relationship between the parties here, Your Honor, I think it is the same because those institutional clients are treated as chains. The only agency that's created by the contract is for chains and they're defined in the agreement in a particular way so that when there's more than one outlet, they're considered to be a chain. But it's the local and state laws that require only one set price and not repeated negotiation. The other thing with regard to those institutions, just keep this in mind, Your Honor, those are sort of drop at the door deliveries. There's no staging of products for resale or anything like that. And so they're very straightforward deliveries. And Appellant Shroofer, for example, testified that based on whether they got, whether BIMBO was able to acquire the overall bid or not, those institutions would come in and out of his route at various times over his years of running his business. And he was happy when they came back because they brought more profit. So it's just a matter of the bidding process that would dictate the limitations on further negotiation, but they had the contractual rights to do so. Judge Sacks. Thank you. I was just gonna ask you whether the New York labor law causes of action were decided as a matter of supplementary or supplemental jurisdiction. I mean, they're state law causes of action. Yes, Your Honor. I believe they were dismissed on the merits here as an exercise of supplemental jurisdiction. I agree with that, but I wonder, I mean, so often we see cases, not necessarily just like this, in which the federal cause of action is decided and the district court declines to decide the state law cause of action. I gather, I'm assuming that in this case, very much an assumption that the district court chose to decide the New York cause of action and was not required to. And I'm asking if that's right or not. I do believe that is right. I'm not aware, and my friend on the other side could correct me if I'm mistaken with regard to the record here, but I'm not aware of either side urging the court not to exercise a supplemental jurisdiction. Well, is there diversity of jurisdiction here? I mean, are the parties diverse? Oh, it's an FLSA claim. I believe it's a federal question is what brought this case into the federal courts because of the FLSA claim. And I would just note that every court- No, I understand that. I'm asking a different question. Oh, I'm sorry. I mean, it's written in the record to indicate whether or not the plaintiffs were diverse from the defendants. I'm not focused on that question, Your Honor, and I apologize. I will see what I can find out about that and let the court know if it's- Oh, I see, yeah. But I would just make this point with regard to New York labor law, which is that everyone agrees, and I think the courts have consistently stated that the New York labor law test is functionally equivalent to the FLSA's test, and that the critical inquiry pertains to the degree of control. And I don't think there's a single case that's ever found a difference in terms of independent contractor status on the merits between the FLSA and New York labor law. But if the court has concerns about that, I do think one possibility would be to affirm on the FLSA and remand for the court to, you know- The question is whether we know enough- The question is whether we know enough to know whether we should do that or not, because I don't recall it's being explicitly addressed, although in other cases like this, the district judge has done the same thing. Yeah, I would just add again, I'm not aware that appellants have raised that issue at all in this appeal. I don't think they're asking this court for that relief. I think it would, at that point, really be waived. So I don't really think it's an issue the court needs to focus on. Then you get into an interesting question as whether it's a waivable or not waivable jurisdiction, but we're nowhere near that yet. Yeah, and I would think, given the discretion related to supplemental jurisdiction generally, I would think that it is waivable. But again, this isn't an issue that's been thoroughly briefed by the parties. If the court would like supplemental briefing to address it at all, we'd be happy to provide that. Okay, for your next, excuse me for this, but for your next argument, you might balance the scales of justice behind you. Oh, thank you, Your Honor. I'll take that under consideration. Okay, thank you, Mr. Salmons. We'll now hear from Mr. Perlmutter for two minutes of rebuttal. Thank you, Your Honors. With regard to the integrality issue that the court raised, the point there is that this was never even argued by BIMBO. The judge simply made a decision on his own to decide that this is what the company does and they're not integral. So the court made that factor up and that was one of our points on our brief. With regard to the New York labor law, Your Honor, I think it did require a more deep analysis because the New York state law, we sent to the court two supplemental authorities post-brief of this issue that talked about what was Fairchester with the same counsel on both sides, which they admitted in their brief in Fairchester in the Nassau County case, were substantially similar on the factual basis. But did you ask the court not to decide it because it's an issue of New York law? We did not ask the court not to decide it, Your Honor. But the lower court and the third department has upheld BIMBO independent operators to be employees under the New York labor law test. In other words, the unemployment board makes a finding and the third department analyzes it under the same control test that the New York labor law uses. So there's already been state findings that drivers such as Shroofer and Franz were independent operators. With regard to the revocation of agency, and my opponent did not really answer the question on institutions, Your Honor, no, my clients have no special skills with regard to the institutions. They drop off bread. That's what they do. George Shroofer was an employee of BIMBO in 1996 when BIMBO unilaterally changed him to an independent contractor or gave him that option. Portions of their geography. We put job descriptions in our brief that demonstrate BIMBO employees work side by side with Shroofer and Franz doing the same exact job duties, same skills that the lower court found to be special. Rotating product, building relationships with store managers, delivering product. He found those to be special skills when those are skills of the employees BIMBO hires. I see my time is up, Your Honor. All right. Let me ask you, I was just looking at his decision. He doesn't assert any jurisdictional basis separate apart from the fact that you raise these claims tied to the FLSA claims, right? You didn't assert diversity of jurisdiction before the court, did you? No, Your Honor. Okay, all right. Thanks. All right.  Thank you, Mr. Perlmutter. Thank you both. Thank you, Your Honor. Thank you both. Thank you. Let me just, off the clock, but let me just ask you, what do you think? Did you like doing this via Zoom with video better than phones? It was interesting. I prefer to be in person. I agree, of course. You've got a unanimous court. This is the next best thing, and it was an honor and a privilege to argue in front of you all freely. I agree, Your Honor. That was very effective. Thank you. Good. All right. Well, that's the goal to make it a little more realistic or just like the old days. I wasn't bad. In person. So thanks. We'll reserve decision. Have a good day. Thank you. You too. Thank you, Your Honors.